## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**JENNIFER GIROUX, et al.,**

       **Plaintiffs,**

         **Case No. 1:22-cv-309**
         **JUDGE DOUGLAS R. COLE**

    **v.**

**FRANK LaROSE, et al.,**

       **Defendants.**

### <u>OPINION AND ORDER</u>

This case highlights the difficulties that arise when federal courts are forced to intervene, late in the day, in state-regulated voting processes. Quite often, such intervention may give rise to a host of collateral—and often unintended—consequences.

Consider the instant case. On May 27, 2022, a three-judge panel of this Court (the "Panel") issued a decision in a different case moving Ohio's primary for certain state offices to August 2, 2022. Five days later, on June 1, 2022, Plaintiff Jennifer Giroux, who wishes to appear on the ballot in that primary, and Lisa Daly, one of Giroux's supporters, sued Ohio Secretary of State Frank LaRose and others in this action, claiming that, in moving the primary back to August, the Panel necessarily also reopened the candidate petition process for that primary. She notes that state law specifies that such petitions must be filed ninety days before the primary—which now, Plaintiffs say, would be May 3, 2022. Although Giroux had a petition ready to go as of that date, when the Panel—some three weeks after May 3—issued the Order

actually moving the primary, Secretary LaRose's directive implementing that Order stated that the candidate petition date would not move in tandem with that new primary date.

In addition to suing, Plaintiffs also moved for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction. ("Motion," Doc. 3). Specifically, they ask this Court to Order the Defendants to accept Giroux's petition. That request for injunctive relief is now fully briefed. (*See* "Opposition,"[1] Doc. 12; "Reply," Doc. 14).

For the reasons stated more fully below, the Court concludes both (1) that Plaintiffs have failed to establish a reasonable likelihood of success on the merits, and (2) that the relief they request creates a substantial risk that Ohio will not be able to conduct a successful primary on August 2, 2022, a result contrary to the public interest. Accordingly, the Court **DENIES** Plaintiffs' Motion.

## BACKGROUND

The facts of this case are largely undisputed. An Ohio statute specifies May 3, 2022, as the date that Ohio will hold its primary election for candidates seeking a party nomination to run for a position in the state legislature this fall. Ohio Rev. Code § 3501.01(E)(1) (setting primary date as "the first Tuesday after the first Monday in May," which this year was May 3, 2022); *see also Gonidakis v. LaRose,* No. 2:22-cv-

---

[1] Strictly speaking, Secretary LaRose and the remaining defendants (the Hamilton County Board of Elections and its members) actually filed two separate opposition briefs. (Docs. 12, 13). However, only LaRose's brief provides substantive arguments against Plaintiffs' Motion, with the County Defendants' short brief simply stating that they adopt Secretary LaRose's arguments as their own. (Doc. 13, #768). Thus, for the sake of simplicity, the Court generally refers to Secretary LaRose's brief as "Defendants' Opposition," and describes all the arguments therein as offered by Defendants collectively.

773, 2022 WL 1175617, at *3 (S.D. Ohio Apr. 20, 2022) (hereinafter "*Gonidakis I*").
Another statute provides that candidates desiring to be included on the ballot for that
primary election must complete the requisite paperwork declaring their candidacy
"not later than four p.m. of the ninetieth day before the day of the primary election"—
or, for this year's election, by February 2, 2022. Ohio Rev. Code § 3513.05. While that
sounds straightforward, things have—unfortunately—not gone according to plan.

To understand why, one must first wind the clock back to 2015, when Ohio's
voters approved an amendment to the State's Constitution establishing a new system
to draw legislative districts. *Gonidakis I,* 2022 WL 1175617, at *4. While not every
aspect of this new redistricting system is relevant to the Court's decision here, three
pertinent provisions require some explanation.

First, under the 2015 amendment, Ohio's voters charged a new entity—the
Ohio Redistricting Commission (the "Commission")—with drawing the map for the
state's legislative elections. *Id.* The Commission is composed of seven members—the
Governor, the Auditor of State, the Secretary of State, one person appointed by the
Speaker of the House of Representatives, one person appointed by the House minority
leader, one person appointed by the Senate President, and one person appointed by
the Senate minority leader. *Id.* The Commission must draw a new map, at minimum,
every ten years based on the results of the federal decennial census.[2] *Id.*

---

[2] How long a legislative map lasts under this system depends on the level of bipartisan
support the map receives within the Commission. "If the Commission votes for a plan with
at least two members of each of the two major political parties in the majority, then the map
applies for ten years. But if the Commission is unable to pass a map with that degree of
bipartisan support, an 'impasse procedure' specifies that the approved map may remain in
effect for only four years." *Gonidakis I,* 2022 WL 1175617, at *5.

Second, in drawing the map, the Commission "shall attempt" to meet three standards described in the Ohio Constitution. First, "[n]o general assembly district plan shall be drawn primarily to favor or disfavor a political party"; second, "[t]he statewide proportion of districts whose voters, based on statewide and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio"; and third, "[g]eneral assembly districts shall be compact." Ohio Const. art. XI, § 6(A)–(C).

Third, the 2015 amendment granted the Ohio Supreme Court "exclusive, original jurisdiction in all cases arising under" the redistricting provisions. *Id.* art. XI, § 9(A). However, that court's power is limited in that it may not "order … the implementation or enforcement of any general assembly district plan that has not been approved by the commission in the manner prescribed by" the redistricting provisions. *Id.* art. XI, § 9(D)(1). Similarly, the Ohio Supreme Court may not "order the commission to adopt a particular general assembly district plan or to draw a particular district." *Id.* art. XI § 9(D)(2).

In 2021, the Commission began work on a new map. *Gonidakis I,* 2022 WL 1175617, at *5. State law required the Commission to complete that map by September 1, 2021. *Id.* "But that assumed the federal government would release the 2020 census data on time in April 2021"—a deadline the Census Bureau missed as a result of the Covid-19 pandemic. *Id.* Instead, the Commission received the necessary census data in August 2021, "more than three months late." *Id.*

Late out of the gate, the Commission did not approve its first map ("Map 1") until September 16, 2021. (Stipulation of Facts, Doc. 16, #841). "But various challengers to the map … sued the Commission under Article XI of the Ohio Constitution." *Gonidakis I,* 2022 WL 1175617, at *5. Ohio's Supreme Court, finding that Map 1 did not comply with the Ohio Constitution, struck the map and ordered the Commission to try again. *Id.*

And the Commission did—three more times. *Id.* at *6. Each time, though, challengers again sued in the Ohio Supreme Court alleging that the maps ("Map 2," "Map 3," and "Map 4") did not comply with constitutional requirements. *Id.* And, each time, the Ohio Supreme Court agreed, sending the Commission back to the proverbial (and literal) drawing board to try again. *Id.*

These delays started to create other problems. By statute, Ohio must hold its primary election for state legislators on May 3. *Id.* at *1. But as the weeks and months passed without a finalized map, it became increasingly uncertain whether the State would be able to meet that deadline—or indeed, whether the State would be able to hold a primary election at all. *Id.*

Against that backdrop, a group of voters, including lead plaintiff Michael Gonidakis, sued in federal court, asking the court to "intervene to protect their right to vote in a primary election for state legislators." *Id.* A three-judge panel was convened in the Southern District of Ohio pursuant to 28 U.S.C. § 2284. *Id.* at *8.

That three-judge panel held an evidentiary hearing. Based on the evidence the parties presented, the Panel ultimately issued two decisions relevant here. First, on

April 20, the Panel concluded that, because of the delays in the redistricting process, it was "too late for Ohio to include the General Assembly races on the ballot for the May 3 primary as statutorily required." *Id.* at *9. Even though the May 3 primary was no longer feasible, however, the Panel found that Ohio could still hold a primary election as late as August 2 "without disrupting the general election" and "without Ohio's elected officials amending the state's election laws." *Id.* But to hold a primary on August 2, Ohio would need to implement a map by no later than May 28. *Id.*

Leery of intervening in the state-regulated redistricting process, but cognizant of its obligation to protect Ohioans' right to vote in a primary, the Panel balanced these competing concerns by staying their hand in the short term, but providing a back-up plan for the longer-term. As to the former, the Panel said: "we stay our hand until May 28" (i.e., the latest date that the Secretary said would work). *Id.* at *2. "But if the State remains unable to implement its own valid map that satisfies federal law" by that date, the Panel held that two consequences would follow. *Id.* Specifically, absent a valid plan as of that date, the Panel (1) would set the primary election for August 2, 2022, and (2) would implement Map 3—one of the maps that the Redistricting Commission had approved, but that the Ohio Supreme Court had rejected. *Id.* at *2–3.

Importantly, a key reason that the Panel chose Map 3 was that using that map would not require as much in the way of a do-over, as pre-election processing had already progressed to a certain extent based on that map. *Id.* at *4. Because proceeding under Map 3 would be a continuation of those processes, the Panel could

6

stay its hand in deciding whether to move the primary for longer than otherwise possible. That in turn promoted the Panel's goal of providing state officials the longest possible runway to achieve a viable map on their own, thereby hopefully obviating the need for federal court intervention at all.

As the May 28 deadline approached, though, it became increasingly clear that the State would not implement its own valid map in time. Consequently, on May 27, the Panel issued a second decision implementing the plan it had proposed in its first decision. *Gonidakis v. LaRose,* No. 2:22-cv-773, 2022 WL 1709146 (S.D. Ohio May 27, 2022) (hereinafter "*Gonidakis II*"). In particular, the Panel stated that, if Ohio failed to approve a map by midnight on Saturday, May 28 (i.e., the next day), then Secretary LaRose—who is a defendant in both that case and this one—was ordered "to push back Ohio's state primaries to August 2, 2022, and to implement Map 3 for this year's elections."[3] *Id.* at *1.

When Ohio did not approve a map by the designated time, Secretary LaRose responded to the Panel's Order by issuing Directive 2022-034 (the "Directive") on May 28, 2022. (Doc. 1-1). There, Secretary LaRose directed the local boards of elections "to implement the General Assembly district plan that was adopted by the Ohio Redistricting Commission on February 24, 2022 [that is, Map 3], and to conduct a primary election for the offices of State Representative, State Senator, and Member of State Central Committee on August 2, 2022," as the Panel had ordered. (*Id.* at #17).

---

[3] The Panel emphasized, however, it was implementing "Map 3 for this year's elections *only*." *Gonidakis II*, 2022 WL 1709146, at *1 (emphasis original).

Before anyone can participate as a candidate in a primary election, though, she must first declare her candidacy with the local board of elections. And recall, Ohio's original statutory timeline for this year's elections called for candidates to file that paperwork by February 2, 2022. Of course, that deadline arose based on the presumed May 3 primary date. With the Panel now pushing the primary back to August 3, Secretary LaRose also needed to address whether the February 2 filing deadline still applied.

In his Directive, Secretary LaRose answered that question in the affirmative: "[t]he federal court order did not alter the partisan candidate filing deadlines for the primary election." (Doc. 1-1, #18). Thus, "[t]he filing deadline for candidates for State Representative, State Senator, or Member of the State Central Committee to file a declaration of candidacy was 4:00 p.m. on February 2, 2022 …. If a declaration of candidacy … was filed after th[at] filing deadline[], the board must reject the candidacy." *Id.*

That's where the Plaintiffs in this case—Jennifer Giroux and Lisa Daly—enter the picture. Giroux originally had filed as a candidate for the Republican nomination in the federal race for Ohio's First Congressional District. (Opp'n, Doc. 12, #456). On April 25, 2022, however, Giroux filed her notice withdrawing from that race. (*Id.* at #463). On May 2, she followed that up by filing a petition seeking the Republican nomination for the Twenty-Seventh District in the Ohio House of Representatives. (*Id.*). Daly is one of Giroux's supporters. (Compl., Doc. 6, #71).

8

While it is undisputed that Giroux filed all the necessary paperwork for the state race, it is also undisputed that she missed the February 2 deadline that the Directive specified by three months. (Mot., Doc. 3, #57). Accordingly, Plaintiffs note, "as a result of Directive 2022-034, the declaration of candidacy and supporting petition of Jennifer Giroux will not be processed by the Hamilton County Board of Elections and, in turn, the Hamilton County Board of Elections will, in compliance with Directive 2022-034, reject the candidacy of Jennifer Giroux for state representative and not place her name on the ballot at the forthcoming primary election now being held on August 2, 2022." (*Id.* at #58).

Opposed to that result, on June 1, 2022, Plaintiffs filed the Complaint in this case. (Doc. 1, *refiled as* Doc. 6). The Complaint asserts claims under 42 U.S.C. § 1983 against the Hamilton County Board of Elections, each of the Board's members, and Secretary LaRose. (Doc. 6, #70, 82). In particular, Plaintiffs argue that the Directive violates the First and Fourteenth Amendments because "it seeks to impose a filing deadline for declaration of candidacy and the associated petition," either "(i) 6 months before the actual primary date of August 2, 2022; or (ii) before the final determination and adoption of the state legislative district maps for which individuals would be candidates in the primary election to be held on August 2, 2022." (*Id.* at #83).[4]

---

[4] The Court notes that Plaintiffs assert their claims solely under the First and Fourteenth Amendments. (Compl., Doc. 6, #82–83). That is, Plaintiffs are not advancing a state-law claim that Secretary LaRose's Directive violates Ohio Rev. Code § 3513.05. That makes sense, as *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), would preclude this Court from instructing Secretary LaRose to follow state law. (In any event, the Ohio Supreme Court, the ultimate expositor on Ohio law, currently has that issue pending before it. *See Demora, et. al v. Ohio Secretary of State, et. al.*, Case No. 2022-0661 (Ohio Sup. Ct.).) If, on

Plaintiffs seek declaratory and injunctive relief, as well as money damages and attorneys' fees. (*Id.* at #83–84).

Also on June 1, Plaintiffs filed the instant Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction. (Doc. 3). There, Plaintiffs ask that the Court: (1) "enjoin and restrain Directive 2022-34 to the extent Defendant Frank LaRose, as the Ohio Secretary of State, has unconstitutionally imposed a petition-filing deadline of February 2, 2022, for those seeking to be candidates for, *inter alia,* state representative at the forthcoming primary election to be held on August 2, 2022;" and (2) prohibit "the Hamilton County Board of Elections and its individual members … from rejecting or otherwise taking adverse actions concerning the declaration of candidacy and petition of Jennifer Giroux," and order them to process Giroux's declaration of candidacy immediately. (*Id.* at #66).

Defendants filed their Opposition to Plaintiffs' Motion on June 8, and Plaintiffs filed a Reply the next day.

## PLAINTIFFS' STANDING

As an initial matter, the Court must address the issue of Plaintiffs' standing. "Federal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Instead, Article

---

the other hand, Plaintiffs are relying on Secretary LaRoae's alleged failure to follow that provision of state law as a basis for their *constitutional* claims, that argument is foreclosed by the related principle that a State's failure to follow its own laws, in and of itself, does not make out a constitutional claim. *See, e.g., Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994) (noting that even state official's arbitrary refusal to follow state law does not give rise to constitutional claim). Either way, the Court does not address in this Opinion whether Secretary LaRose's Directive complies with the language of Ohio Rev. Code. § 3513.05.

III of the United States Constitution cabins the power of the federal judiciary by limiting its jurisdiction to only "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl.1. To show the existence of a qualifying "Case" or "Controversy"—that is, to invoke Article III powers—a plaintiff must show that he or she has a "personal stake" in the case, or in other words, has "standing." *Raines v. Byrd*, 521 U.S. 811, 818–19 (1997).

In determining whether a plaintiff has carried her burden to show standing, the Court applies "well-worn yet enduring standards." *Thomas v. TOMS King (Ohio), LLC*, 997 F.3d 629, 634 (6th Cir. 2021). The "irreducible constitutional minimum" of standing includes the following three elements: (1) that the plaintiff has suffered an injury in fact, (2) that the injury is "fairly traceable" to the defendant's conduct, and (3) that the injury is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Here, Defendants contend that Plaintiffs fail on the third prong: redressability. According to Defendants, whatever this Court may rule, Plaintiff Giroux cannot qualify for inclusion on the primary ballot for an Ohio House race. That is because Ohio law prohibits individuals from seeking multiple federal, state, or county offices in the same election. (Opp'n, Doc. 12, #467 (citing Ohio Rev. Code § 3513.052(A)). And Ohio's Revised Code implements that rule by prohibiting the Secretary from accepting a second declaration of candidacy from anyone who has already filed a previous declaration of candidacy for another office at the same election. Ohio Rev. Code § 3513.052(B). Here, Defendants note, "on March 2, 2022, Giroux filed a

declaration of candidacy with the Hamilton County Board of Elections to be a candidate for the U.S. House of Representatives." (Opp'n, Doc. 12, #465). Thus, they claim, she cannot file another declaration for a different office, meaning her petition for the state race would fail, even if this Court moved the deadline, thereby making the petition timely.

That said, Defendants concede that a candidate can qualify for a new race if she "timely withdraws" from the previous race. (*Id.* at #467). "Timely withdraws" means—in pertinent part—"withdrawing as a candidate before the applicable deadline for filing a declaration of candidacy … for the subsequent office for which the person is seeking to become a candidate at the same election." (*Id.* (citing Ohio Rev. Code § 3513.052(G))). Here, Giroux withdrew her candidacy for the U.S. House of Representatives on April 25, which was before she filed her declaration of candidacy for the Ohio House of Representatives on May 2. (*Id.* at #466). However, Defendants argue that—*at the time Giroux withdrew her federal candidacy* (or even at the time she filed her state candidacy)—the *Gonidakis* Panel had not yet moved the May 3 primary to August. Thus, at the time of her withdrawal from the federal race, the deadline for Giroux to declare her candidacy for the Ohio House was indisputably February 2. (*Id.*). Accordingly, Defendants claim, Giroux did not withdraw her federal-race petition before her state-race petition was due. (*Id.*). Essentially, Defendants argue that Giroux's withdrawal was untimely when made, and could not become timely even if the state-race filing deadline later changed. Based on that, Defendants assert that Giroux will be "ineligible to run for the Ohio

House in 2022 *however* this Court rules on her challenge to Directive 2022-034. As such, both Giroux and Daly lack the constitutionally required standing to bring this case." (*Id.* at #468 (emphasis in original)).

The Court is not persuaded. The key question is whether Giroux withdrew "as a candidate [from the federal race] before *the applicable deadline* for filing a declaration of candidacy for" the Ohio House of Representatives. Ohio Rev. Code § 3513.052(H)(2)(a) (emphasis added). The problem, of course, is determining, on the facts here, what the statutory reference to the "applicable deadline for filing a declaration of candidacy" means. Defendants read that phrase to mean the deadline that was in effect for the state race *at the time Giroux withdrew her candidacy from the federal race on April 25*—or, in other words, February 2. Giroux, by contrast, asks the Court to read the statute to adopt a rule under which a withdrawal from a previous race is timely so long as the candidate had withdrawn from that previous race in time to file a timely petition for the subsequent race. Under that reading, even if Giroux's withdrawal from the federal race was originally untimely (as she could not file a timely petition for the state race at the time she withdrew), that previous withdrawal could become timely if the February 2 deadline was subsequently moved to some date after April 25, which is the very relief that Giroux requests the Court to order here.

Which of the above proposals correctly reads Ohio Rev. Code § 3513.052(H)(2)(a) is—perhaps unsurprisingly—a novel question of state law. While the Court concedes this is a close call, the Court finds the latter interpretation more

persuasive for two reasons. First, the phrase "applicable deadline for filing a declaration of candidacy" is most naturally read as referring to the deadline that *actually applies* to that declaration. To be sure, at one time the deadline that applied to the state-office race here was February 2, but if this Court changes that deadline, then the deadline that would actually apply to the declaration of candidacy would be the deadline the Court adopted. Second, the statute's underlying purpose further supports this result. The "timely withdrawal" provision is meant to prevent a person from running for two different offices in the same election. Here, though, Giroux withdrew her candidacy from the federal race *before* filing the declaration of candidacy that she asks the Court to find valid here. That is, assuming the Court finds her new declaration of candidacy to be timely filed, there is no point in time at which Giroux would have been running for both a federal office and a state office in this election. As Defendants' interpretation of Ohio Rev. Code § 3513.052(H)(2)(a) is a worse fit, both in terms of the statute's language and its express purpose, the Court declines to adopt it. Accordingly, the Court finds that, if Giroux obtains the relief she seeks, her candidacy would be valid under Ohio law, meaning that she meets the redressability prong of the standing inquiry. And, as that is the only prong that Defendants contend is lacking, the Court concludes that Plaintiffs have standing here.

## LAW AND ANALYSIS

With the jurisdictional inquiry out of the way, the Court turns its attention to the merits of Plaintiffs' Motion. On that front, Plaintiffs seek a permanent injunction,

a preliminary injunction, and a temporary restraining order. (Mot., Doc. 3). Because different considerations apply to the first of those, the Court starts there before turning to the latter two, which the Court addresses in tandem.

## A.    The Request For Permanent Injunctive Relief Is Not Ripe.

Turning first to that portion of Plaintiffs' Motion seeking a permanent injunction, the Court concludes that it must **DENY** the request on procedural grounds. Specifically, as another Judge in this District observed, "[i]ssuance of a permanent injunction is not proper until some final entry in [the] matter." *Hogan v. Cleveland Ave Rest., Inc.*, No. 2:15-cv-2883, 2021 WL 963746, at *1 (S.D. Ohio Mar. 15, 2015). Where—as here—"the merits of [a] case have not yet been adjudicated, … [the] Plaintiffs cannot show 'actual success on the merits' as required to obtain a permanent injunction. Absent final judgment as to some claims or parties under Fed. R. Civ. P. 54(b), [a] request for a permanent injunction is premature and unripe."[5] *Id.; see also Skycasters, LLC v. Hughes Network Sys., LLC,* No. 5:06-cv-1094, 2006 WL 8454315, at *7 n.14 (N.D. Ohio Jun. 2, 2006) ("Plaintiff simultaneously moved for both preliminary *and* permanent injunctive relief. To the extent [plaintiff's motion] seeks a permanent injunction, it is premature and is denied for record purposes. If plaintiff does prevail in this lawsuit, it may be appropriate to enter some form of permanent injunctive relief. The Court need not decide that now."). That still leaves,

---

[5] To be clear, this is not "ripeness" in the jurisdictional sense. That is, the Court does not hold that the case itself is "unripe" (which would entirely deprive the Court of jurisdiction over the matter). Rather, the point is that it would be premature for the Court to consider the merits of permanent injunctive relief until such time as the Court is prepared to enter a final judgment.

though, Plaintiffs' requests for a preliminary injunction and a temporary restraining order, to which the Court turns next.

## B. The Court Denies Plaintiffs' Request For A Preliminary Injunction And TRO.

### 1. The Applicable Legal Standards

"Federal Rule of Civil Procedure 65 empowers district courts to issue temporary restraining orders or preliminary injunctions 'to preserve the status quo so that a reasoned resolution of a dispute may be had.'" *Harsman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 1:21-cv-597, 2021 WL 4504245, at *2 (S.D. Ohio Sept. 30, 2021) (quoting *Procter & Gamble Co. v. Bankers Tr. Co.,* 78 F.3d 219, 227 (6th Cir. 1996)). "The standards for obtaining a temporary restraining order or a preliminary injunction are the same." *Id.* (citing *Workman v. Bredesen*, 486 F.3d 896 (6th Cir. 2007)). Accordingly, the Court addresses Plaintiffs' requests for a temporary restraining order and a preliminary injunction jointly.

"The party seeking [a] preliminary injunction bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). And it is a heavy burden. As the Sixth Circuit has observed more than once, "preliminary injunctions are 'extraordinary and drastic remed[ies] ... never awarded as of right.'" *Platt v. Bd. of Comm'rs on Grievances and Discipline of Ohio Sup. Ct.,* 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)); *Am. Civ. Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (same). Rather, such relief "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington- Fayette*

*Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002*); see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (noting that a "preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it'") (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)) (brackets and internal quotation omitted).

The framework for assessing whether a plaintiff has carried her burden is also well settled—the Court considers four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). No one factor is determinative, rather, the Court should "balance[] [the factors] against each other." *Overstreet*, 305 F.3d at 573 (citing *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998)). That said, a finding that there is no likelihood of success on the merits tips that balance in such a way that is "usually fatal" to the request for a preliminary injunction. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller,* 103 F.3d 1240, 1249 (6th Cir. 1997)). The Court considers each of those factors in turn.

## 2.    Plaintiffs Have Not Demonstrated A Strong Probability Of Success On The Merits.

To satisfy the first prong, a movant must "show[] a strong or substantial likelihood or probability of success on the merits." *Bossert v. Springfield Grp., Inc.*, 579 F. Supp. 56, 66 (S.D. Ohio 1984); *Warner v. Cent. Tr. Co.*, 715 F.2d 1121, 1124 (6th Cir. 1983) ("Since the district court did not find that appellant had shown a strong or substantial likelihood that he could prove fraud in the transaction which produced the letter of credit, the first 'prong' of the traditional test for a preliminary injunction has not been met.").

In this case, Plaintiffs advance two separate theories that the Directive's February 2 deadline to file paperwork declaring one's candidacy is unconstitutional. First, they argue that "a filing deadline of 6 months ahead of the primary election imposes a severe burden upon the speech and associational rights of Plaintiffs and their supporters." (Mot., Doc. 3, #59). Second, in the alternative, Plaintiffs argue that the February 2 deadline was unconstitutional because it required candidates to file their candidacy declarations before legislative districts were finalized with the implementation of Map 3 on May 28. (*Id.* at #60–61).

"When deciding whether state election laws violate a plaintiff's associational rights and the right to vote effectively under the First and Fourteenth Amendments, [courts] apply the framework set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)." *Graveline v. Benson*, 992 F.3d 524, 534 (6th Cir. 2021) (cleaned up). This is known as the *Anderson-Burdick* framework.

Under the *Anderson-Burdick* framework, "the court must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Mich. State A. Randolph Philip Inst. v. Johnson,* 833 F.3d 656, 662 (6th Cir. 2016) (quoting *Green Party of Tenn. v. Hargett,* 791 F.3d 684, 693 (6th Cir. 2015)). "Second, the court 'must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id.* (quoting *Hargett,* 791 F.3d at 693). Third, the Court must "determine the legitimacy and strength of each of those interests and consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quoting *Hargett,* 791 F.3d at 693).

In applying this third step, "'the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent' of the burden that the law imposes on the rights of voters." *Id.* (quoting *Burdick*, 504 U.S. at 434). If the court determines at the first step that the burden is severe, then at the third step the court applies "strict scrutiny and the law 'must be narrowly tailored and advance a compelling state interest.'" *Id.* (quoting *Hargett,* 791 F.3d at 693). But if a court instead finds at the first step that the law imposes a "'reasonable and nondiscriminatory' burden, 'the statute will be subject to rational basis review and [will] survive if the state can identify important regulatory interests to justify it.'" *Id.* (quoting *Hargett,* 791 F.3d at 693) (modifications omitted). Finally, if the burden is somewhere between these two extremes, "courts will weigh the burden on the

plaintiffs against the state's asserted interest and chosen means of pursuing it." *Id.* at 662–63 (quoting *Hargett*, 791 F.3d at 693).

### a. The February 2 Registration Deadline Imposed A Reasonable And Nondiscriminatory Burden.

As noted, the inquiry starts by assessing "the character and magnitude of the asserted injury." *Johnson,* 833 F.3d at 662. Here, Plaintiffs argue that the February 2 deadline to file declarations of candidacy, if enforced, would "impose a significant or severe burden upon [Plaintiffs'] speech and associational rights." (Mot., Doc. 3, #60). In support, Plaintiffs first note that the February 2 deadline would have required Giroux to declare her candidacy (1) six months before the state primaries were ultimately set to occur, and (2) nearly four months before the precise boundaries of Giroux's legislative district were settled.

To determine whether a restriction imposes a "reasonable" burden, a "severe" burden," or something in-between, courts consider two factors: (1) "content-neutrality" and (2) "alternate means of access." *Daunt v. Benson,* 999 F.3d 299, 311 (6th Cir. 2021) (quoting *Citizens for Legis. Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998)). As the Sixth Circuit has explained, "[f]irst, and most importantly, a law severely burdens voting rights if it discriminates based on content instead of neutral factors." *Miller*, 144 F.3d at 921. Second, "a law severely burdens voting rights if the burdened voters have few alternate means of access to the ballot." *Id.* The Court considers each of these factors below.

*i.    The Directive Is Content Neutral.*

The content-neutrality inquiry reflects what amounts to a non-discrimination principle. "A law would not be content-neutral, and would thus impose a severe burden, if it limited political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Daunt,* 999 F.3d at 311 (modifications and internal quotation marks omitted).

For example, in *Anderson,* the Supreme Court struck down an Ohio law requiring independent candidates to declare their candidacy in March in order to appear on the ballot in the November general election. *Anderson,* 460 U.S. at 799. As the Court explained, although independent candidates were required to declare well in advance of the general election, "the name[s] of the nominees of the Democratic and Republican parties [would] appear on the Ohio ballot" automatically—"even if [those parties' nominees] did not decide to run until after Ohio's March deadline had passed." *Id.* The Court held that these different timelines had a disparate impact on independent candidates and their voters. *Id.* at 790. As the Court explained,

> [i]n election campaigns, … the candidates and the issues simply do not remain static over time. Various candidates rise and fall in popularity; domestic and international developments bring new issues to center stage and may affect voters' assessments of national problems. Such developments … may … create opportunities for new candidates. Yet Ohio's filing deadline prevents persons who wish to be independent candidates from entering [this] political arena … at any time after mid to late March. At this point developments in campaigns for major-party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months. Candidates and supporters within the major parties thus have the political advantage of continued flexibility; for independents, the inflexibility imposed by the March filing deadline is a correlative disadvantage because of the competitive nature of the electoral process.

*Id.* at 790–91 (internal citations omitted). In short, the Court recognized independent voters as a relevant group for the discrimination inquiry, and concluded that Ohio's "March filing deadline place[d] a particular burden on an identifiable segment of Ohio's independent-minded voters." *Id.* at 792.

Importantly, though, the Sixth Circuit's more recent decision in *Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005), confirms that it is the discrimination, more than the burden itself, the drives the analysis. In *Lawrence*, the plaintiffs also challenged as unconstitutional a March deadline to declare one's independent candidacy for the November general election. Specifically, independent candidates were required to declare their candidacy by no later than the day before the partisan primaries occurred. In contrast, candidates who hoped to participate in the primaries were required to have "filed a declaration of candidacy sixty days before the primary election." *Id.* at 373. Although the declaration deadlines for partisan candidates and independent candidates were different, the Court concluded that the regulations were content-neutral in that they did not place the independent candidates at a disadvantage against the partisan nominees. As the Court explained, "all candidates seeking a place on the ballot in November must engage in substantial campaign work before the early primary in order to obtain a space on the [November] ballot." *Id.* For example, "[t]hose running in a primary must file sixty days before the primary campaign, and win their party's primary." *Id.* In contrast, "independent candidates [had to] spend the time before the primary acquiring the requisite number of signatures and then file their petition the day before the primary." *Id.* Ultimately

though, "no particular group … [felt] the additional burden of being placed at a disadvantage with respect to the rest of the field." *Id.* Accordingly, the Sixth Circuit concluded that "the burden imposed by [the state's] early deadline [was] nondiscriminatory," and the court thus concluded that the burden was "reasonable." *Id.*

Applying *Anderson* and *Lawrence* here, the Court concludes that Plaintiffs are unlikely to succeed in demonstrating that the February 2 deadline disadvantages an "identifiable political group." *Daunt,* 999 F.3d at 311. Indeed, Plaintiffs do not even suggest that Giroux and Daly were members of any such group. Rather, the instant case strikes the Court as similar to *Miller,* where the Sixth Circuit found a lifetime term limit was content-neutral because the restriction

> burden[ed] no voters based on the content of protected expression, party affiliation, or inherently arbitrary factors such as race, religion or inherently arbitrary factors such as race, religion, or gender. It [also] burden[ed] no voters based on their views on any of the substantive issues of the day, such as taxes or abortion. Apart from the term limits issue, voters who favor experience are not in any sense a recognized group, and we are aware of no historical bias against incumbent politicians or their supporters.

*Miller,* 144 F.3d at 922.

Just so here. The Court is not aware of any "historical bias" against, for example, "supporters of Giroux." To be sure, Giroux could perhaps point to her non-incumbency, or her status as a female candidate, as a basis for claiming membership in groups subject to such historical bias. (It is worth noting, though, that she did not argue either.) But, even then, it is not at all clear how either of those groups is disparately impacted by the February 2 deadline. Rather, like in *Lawrence,* to the

extent that Plaintiffs were burdened by this registration deadline, that burden would appear to have fallen on all candidates equally. For that reason, the Court concludes Plaintiffs are unlikely to be able to demonstrate that Ohio's February 2 declaration deadline was discriminatory or not content-neutral.

### ii.  *Plaintiffs Had Alternate Means of Access.*

Separately, Plaintiffs could attempt to demonstrate that the burden is severe by showing that the Directive deprives candidates of adequate alternative means of accessing the ballot. Unfortunately, case law offers less clarity on exactly what such a showing entails. In *Daunt,* for example, the Sixth Circuit simply explained that "a law would impose a severe burden if it left few alternate means of access to the ballot," thereby "restricting the availability of political opportunity." 999 F.3d at 311. What the Court takes from that, however, is that the inquiry turns on the *degree* to which a restriction burdens the electorate—rather than the extent to which it has a disparate impact on certain groups. For example, in *Daunt,* the plaintiffs challenged a Michigan law that prohibited individuals from serving as members of Michigan's Redistricting Commission if they had served in certain political roles (i.e., candidates, elected officials, lobbyists, etc.) at any point in the previous six years. *Id.* at 304. The Sixth Circuit concluded that the law's eligibility criteria did not "present substantial concerns regarding alternate means of access. The criteria restrict eligibility for an array of individuals with partisan ties, but those restrictions look back only to the past six years, and … [a] waiting period is hardly a significant barrier to candidacy."

*Id.* at 311 (internal citations and quotation marks omitted). In other words, it is the significance of the barrier that matters.

Here, Plaintiffs essentially argue that the February 2 deadline severely burdened Giroux's access to the ballot because it forced her to declare her candidacy prematurely. This is true, she says, in two regards. First, the deadline is too far in advance of the primary, and, second, it lapsed before the boundaries of her legislative district had been set. And these ballot-access burdens, she argues, apply not only to Giroux, but to every other would-be candidate hoping to run in the state primaries and—by extension—to all the supporters (such as, in Giroux's case, Daly) hoping to vote for them. Thus, she claims, they are a significant barrier.

The Court is not persuaded. Start with Plaintiffs' contention that a six-months-before-the-primary registration period is too long. Case law suggests otherwise. In *Lawrence*, the Sixth Circuit found a state restriction was "reasonable" and "nondiscriminatory" where it required independent candidates to declare their candidacy in early March—*eight months* before they would first appear on a ballot in November. 430 F.3d at 373–74. According to the appeals court, "[t]he filing deadline for independent candidates is not so early that a diligent candidate cannot meet the requirement." *Id.* at 373. Here, the Directive essentially required Giroux to declare her candidacy six months before she would ultimately appear on the primary ballot. As in *Lawrence*, that is not so early that a "diligent candidate" could not meet that requirement. Thus, to the extent that the filing deadline burdened Giroux's First and

Fourteenth Amendment ballot-access rights on a too-long-before-the-election basis, the burden does not strike the Court as particularly severe.

That said, in fairness to the Plaintiffs, previous courts have found that early deadlines to declare one's candidacy can—under certain circumstances—constitute a severe burden. For example, in *Anderson,* the Supreme Court found Ohio's early deadline for independent candidates to register imposed a severe burden on would-be candidates and their supporters. 460 U.S. at 790–91. But to read *Anderson* as meaning *any* early candidate registration deadline constitutes a severe burden would "gloss over a vital distinction." *Lawrence*, 430 F.3d at 373. As the Sixth Circuit explained, "[t]he early deadline discussed in *Anderson* imposed such a significant burden because it put independent candidates at a disadvantage vis-à-vis the major parties' nominees who were not named until nearly five months later." *Id.* However, where "[a]ll candidates are burdened by [a state] choos[ing] to conduct its primary at an early date, but … no particular group … feels the additional burden of being placed at a disadvantage with respect to the rest of the field," the burden would be "nondiscriminatory." *Id.* Under such circumstances, the Sixth Circuit has found, "there is no reason for [the] Court to conclude that [a] burden placed on all candidates" to undertake early efforts to appear on the ballot is "severe or inherently unreasonable." *Id.*

Thus, as noted, *Lawrence* clarifies that burdens matter more for *Anderson* purposes when those burdens are discriminatory. Here, as discussed at length above, no such concerns arise—the burden of Ohio's February 2 deadline fell on Giroux with

equal force as it did on all other candidates. Thus, the six-months-in-advance argument does not carry the day for Plaintiffs.

That still leaves, though, Plaintiffs' argument that the February 2 deadline severely limited Giroux's access to the ballot by forcing her to declare her candidacy before the exact borders of her legislative district had been set. The Court begins its analysis on this front by noting that none of the parties in this action have directed the Court to any authority considering this precise issue, nor has the Court discovered any. Of course, given the unique trajectory that Ohio's redistricting process has followed this year, it would not surprise the Court if no such precedent exists. In the absence of case law directly on point, the Court concludes that, at least in Giroux's case, the burden imposed by any uncertainty as to the final borders of Giroux's legislative district at the time she would have been required to file was far from severe.

That is not to say that Giroux's argument has no appeal. It is admittedly difficult for a person to know whether she wishes to run for an office without knowing the exact contours of the district in which she would be running. An initial map that suggests her candidacy would be promising could change in ways that would make her prospects more tenuous. But here this concern is largely obviated by the fact that Ohio's requirements to declare one's candidacy for an Ohio House race are quite modest. Individuals seeking a major party's nomination (as Giroux is) need only (1) file a declaration of candidacy; (2) obtain a minimum of fifty signatures from individuals of the same party; and (3) pay an $85.00 filing fee. Ohio Rev.

Code §§ 3513.05, 3513.10. The point is merely this—to the extent Giroux argues that she should not have been forced to "go through the hoops" of declaring her candidacy before knowing her district's final borders, those "hoops" were minimal. That is, the Court concludes that Giroux faced no substantial burden in collecting the required signatures, paying the filing fee, waiting for the map of her district to be finalized, and then determining whether she wished to pursue her candidacy or withdraw. Even if she ultimately chose not to continue her candidacy, at most she would have lost the time it took to collect the signatures and the cost of her filing fee—neither of which strike the Court as imposing a particularly severe burden.

Relatedly, Giroux might argue that it would be difficult for her to collect the requisite *signatures* for her petition if she did not know her district's boundaries. After all, in most election years, the signers must be "electors," or in other words persons who reside in the district. Ohio Rev. Code § 3513.05. So if a putative candidate does not know the district boundaries, collecting valid signatures could be difficult. But that is no longer the rule in Ohio—at least for this election. Rather, recognizing the difficulties that the ongoing redistricting saga was creating, on January 28, 2022, Ohio's General Assembly enacted House Bill 93, which stated that

> a signature on a declaration of candidacy and petition or nominating petition filed by a person seeking nomination for the office of member of … the Ohio House of Representatives … shall not be considered invalid on the ground that the signer does not reside in the district the filer seeks to represent, so long as … both of the following are true: (a) The House district in which the filer resided under the General Assembly district plan adopted by the Ohio Redistricting Commission in September 2021 [that is, Map 1] had territory in the county in which the signer resides. (b) The House district the filer seeks to represent has territory in the county in which the signer resides.

H.B. 93 § 4(D), 134th Gen. Assemb. (Ohio 2022). Moreover, this provision was enacted as emergency legislation, meaning it became effective immediately upon the Governor's signature on January 28. *Id.* § 5. Thus, so long as a portion of a signatory's county of residence fell within a candidate's district under Map 1, and some portion of that same county also fell within a candidate's district under the map that was ultimately adopted, that signature on the petition would be considered valid.

That rule makes Giroux a bad representative to advance any argument about the uncertainty surrounding the signature requirement. Although Giroux's briefing is not clear on the exact district in which she resided under Map 1, her Complaint makes clear she is a Hamilton County resident. (Compl., Doc. 6, #72). And under Map 1, *all* of the districts making up Hamilton County (districts 24 through 30) fell *entirely* within Hamilton County. Ohio Secretary of State, County Populations and Filing Locations: Ohio House Districts (Sept. 15, 2021). Stated differently, no district in Hamilton County crossed county lines to an adjacent county. Thus, every valid signature Giroux would have collected under Map 1 would have been from a Hamilton County resident. But under Map 3, which is the map that the Panel ordered Ohio to use for the August primary, every one of those districts also included solely Hamilton County. Ohio Secretary of State, County Populations and Filing Locations: Ohio House Districts (Feb. 24, 2022). In short, every signature Giroux would have collected under Map 1 would have also worked under the final map Ohio will use. Thus, there was no risk, at least to Giroux, that any signatures she collected for her petition would

have been invalidated as a result of redistricting, meaning that, at least as applied to her, this argument does her little good in establishing a ballot-access burden.

Because Plaintiffs have not demonstrated that the Directive's mandate to enforce the February 2 filing deadline was discriminatory, and because that mandate did not otherwise substantially restrict candidates' access to the ballot, the Court concludes that any burden the Directive's mandate creates is "reasonable" as that term is used in step one of the *Anderson-Burdick* framework.

### b. Ohio Offers Compelling Interests To Maintain The February 2 Deadline.

*Anderson-Burdick*'s second step requires the Court to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Johnson,* 833 F.3d at 662; *see also Thompson v. DeWine,* 959 F.3d 804, 811 (6th Cir. 2020) (whether a burden on "[p]laintiffs' First Amendment rights passes constitutional muster depends on whether the State has legitimate interests to impose the burden that outweigh it"). The Court concludes that the interests the State has identified here are weighty.

Defendants argue that they have a compelling interest in leaving the February 2 deadline intact because, under Ohio law, "boards of election must have the ballots that go to military and overseas civilian personnel … ready by no later than 46 days before an election, which, based on an August 2 primary election, is June 17." (Opp'n, Doc. 12, #478). To have these ballots ready to ship by that time, Defendants state that "the boards of election [must] have candidates finalized no later than June 10, 2022"—a date which has already passed. (*Id.*). And Defendants also describe the

consequences that may ensue from failure to respect that deadline. According to the Deputy Secretary of State, considering potential new candidates—that is, those who filed their petitions in early May—for inclusion on the ballot would create "significant, and potentially disastrous, risks to the election administration process and for the local boards of elections that are making their best efforts to administer an additional, unplanned, statewide primary election in 2022 in an accurate and secure manner, under intense scrutiny, on a compressed and expedited timeline." (*Id.* at #457).

Giving Defendants the benefit of the doubt with regard to these factual allegations, which the Court must, given the short lead time it has to decide the Motion, the Court agrees that Defendants' interests in maintaining the February 2 deadline are compelling.[6] Specifically, given that testimony, it appears that granting Plaintiffs' request would force the Court also to extend Ohio's deadline—enshrined in state law—to prepare ballots for military and overseas voters. But Ohio's preparations for its 2022 primary election already have been marred by uncertainty—uncertainty that has forced the state's judicial, executive, and legislative branches, as well as federal courts, to repeatedly intervene. Time is quickly running out. Indeed, in weighing the State's interest here, the Court must be mindful of the Sixth Circuit's

---

[6] At the preliminary telephonic status conference on the Motion, the Court noted that the timeline the parties were suggesting for resolving the Motion would not allow an opportunity for cross-examination of the factual assertions that either side advanced. The parties advised the Court that they understood this limitation, that the facts were largely undisputed, and that the Court should rely on the factual assertions that the parties tendered by way of affidavits. Of course, if this case were to move forward, any factual determination that the Court makes in this Opinion is preliminary, and is subject to revision if, and to the extent that, additional evidence supports a different factual finding.

admonition that "rewriting a state's election procedures or moving deadlines rarely ends with one court order. Moving one piece on the game board invariably leads to additional moves." *Thompson*, 959 F.3d at 813. The events of the past few months offer ample evidence of the wisdom in this warning, and this Court must be cautious that any order delaying Ohio's deadlines further could have unanticipated second, third, and fourth order effects that might undermine the fundamental integrity of Ohio's electoral process. *Beiersdorfer v. LaRose,* No. 20-3557, 2021 WL 3702211, at *12 (6th Cir. Aug. 20, 2021) ("The State's interest in preserving the integrity of the electoral process is undoubtedly important.").

Defendants also point to another related factor supporting this same result. In particular, the *Gonidakis* Panel chose the remedy it did there—a May 28 drop-dead date for the federal court to move the primary and impose Map 3—based on its understanding that the candidate deadline (i.e., February 2) would *not* simultaneously move. As the Secretary's attorney explained during that hearing:

> [Using Map 3] would, in terms of timing, allow for the use of the more compressed time frame because the map three calendar would be a continuation of what has already been done. So it wouldn't be reopening candidate filing. It wouldn't be reopening the certification of candidates and petitions which is that 90-day window.

(Mar. 30, 2022 *Gonidakis* Hr'g Tr., Doc. 12-2, #593). In short, the Panel was able to delay intervening in Ohio's electoral processes until fewer than ninety days before the August 3 primary date that the Panel ultimately imposed precisely *because* the Panel did not need to include time for such filings. But now here, Giroux asks this Court to impose an obligation on the Boards of Elections (i.e., considering new candidate petitions) that the *Gonidakis* Panel assumed would not happen. In essence,

Giroux asks this Court to undercut a key factual assumption that led the *Gonidakis* Panel to wait as long as it did. In practical terms, then, the instant case amounts to almost a form of collateral attack on the decision there. Or, at the very least, the request for relief here ignores the factual findings that were the tacit underpinnings for the relief the Panel ordered in *Gonidakis*—underpinnings, it should be noted, on which the State relied in proposing the date for federal court action in that lawsuit that it did. This Court is hesitant to interfere, at this late date, either with the remedial framework that the *Gonidakis* Panel ordered, or the State's reliance interest that underlies that Panel's decision to implement that relief.

For all of these reasons, the Court ascribes heavy weight to Ohio's interests in maintaining the February 2 deadline.

### c.    The State's Interests Outweigh Plaintiffs' Burden.

The third and final step of the *Anderson-Burdick* framework instructs the Court to "determine the legitimacy and strength of each of [the State's] interests and consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Johnson,* 833 F.3d at 662. In applying this test, as noted, courts apply different standards of review based on the severity of the burden on a plaintiff's rights. If a burden is severe, the Court applies strict scrutiny; if a burden is "reasonable" and "nondiscriminatory," then the Court applies rational basis review. For those burdens lying somewhere in between, the Court applies an intermediate standard. *Id.* at 662–63.

As previously discussed, in this case, the February 2 registration deadline was nondiscriminatory and reasonable, thus the Court applies rational basis review. Under rational basis review, and given the preliminary factual findings here, there is simply no question that the Directive is lawful. As already noted, any burden that the Directive imposes is at worst minimal, and the State's pressing interest in holding a timely and effective election outweighs that burden. Accordingly, the Court finds that the Plaintiffs have failed to demonstrate likelihood of success on the merits.

But, even if the Directive were subject to intermediate scrutiny, or perhaps even strict scrutiny, that result would not change. The interests that the State raises, and the specter of harm to those interests that it invokes, are issues this Court must take seriously. If, as Defendants contend, moving the candidate filing deadlines would create "potentially disastrous risks" for successfully completing an election, that harm suffices to justify even relatively substantial burdens on candidate access. A successfully administered election presenting the voters with a choice among n-1 candidates, or even n-2 candidates—those who filed their paperwork for a given office by the February 2 deadline—is better than no successful primary election at all.

## B.   The Court Declines To Grant A Preliminary Injunction.

Aside from the movant's likelihood of success on the merits, in granting a preliminary injunction, the Court must also consider (1) whether the movant would suffer irreparable injury without the injunction; (2) whether issuance of the injunction would cause substantial harm to others; and (3) whether the public interest would be served by the issuance of the injunction. *Schlissel*, 939 F.3d at 763.

34

As to the first of these factors—whether the movant would suffer irreparable harm—while the Court considers Plaintiffs unlikely to prevail on the merits, to the extent they *have* identified a potentially viable constitutional claim, blocking Giroux from the ballot would admittedly qualify as an irreparable injury. The first round of primary ballots will soon be printed and shipped to overseas voters. As a result, it would be exceptionally difficult—basically, impossible—to add Giroux as a candidate in this election at a later date. In short, the Court's failure to order the preliminary relief she requests here forecloses Giroux's ability to participate in the August 2 primary, and thus also precludes her from any possibility of being a major-party candidate in the November 2022 election. The Court agrees that this constitutes an irreparable injury to her (and her supporters), and this factor thus favors Plaintiffs.

That leaves the last two factors—substantial harm and the public interest. When the government is the defendant, these inquiries effectively merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). And here, these two factors point in favor of denying the relief that Plaintiffs request. Given the nature of the *Anderson-Burdick* framework, much of the analysis as to these factors is merely a repeat of the issues the Court already addressed in assessing Plaintiffs' likelihood of success on the merits. In that regard, as noted above, Defendants have offered compelling evidence that the injunction Plaintiffs request would impose substantial risks and hardships on the State's ability to conduct its August primary. As just one example, granting the request would effectively force this Court also to extend Ohio's deadline to send ballots to military and overseas voters to accommodate the changes that would need

to be made to the ballots. *See Thompson,* 976 F.3d at 619 (conducting a preliminary injunction analysis and noting that "Ohio will soon print ballots for overseas and military voting. Because 'federal courts are not supposed to change state election rules as elections approach,' [the balance of equities] favors Ohio.") (citations omitted). And the example merely illustrates the broader point—Ohio has a compelling interest in ensuring its statutorily-enshrined deadlines in this election are respected to the fullest extent possible. *Id.* ("It's in the public interest that we give effect to the will of the people 'by enforcing the laws they and their representatives enact.'"). Tinkering with those deadlines now—what the *Gonidakis* Panel referred to as "tugging on [the] strings" of the election, *Gonidakis I,* 2022 WL 1175617, at *22— raises a meaningful prospect that Ohio's primary election will fall prey to the most immutable law of all, the law of unintended consequences. Given the magnitude of the potential harms that the Defendants have identified to the overall election effort, the Court concludes that final two factors of the preliminary injunction analysis counsel strongly against awarding the preliminary relief that Plaintiffs seek. As the Sixth Circuit observed just last Friday, "courts generally decline to 'disrupt imminent elections absent a powerful reason for doing so.'" *Conyers v. Garrett*, No. 22-1494, 2022 WL 2081475, at *1 (6th Cir. June 10, 2022) (quoting *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016)); cf. *Serv. Emps. Int'l Union Loc. 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) (per curiam) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored."). There is substantial wisdom in that approach, and this Court finds it compelling here.

In short, while Plaintiffs have identified a potential irreparable injury, in light of the Court's conclusion on the first, third, and fourth prongs of the preliminary injunction analysis, the Court determine that this potential injury does not give rise to a right to the injunctive relief that Plaintiffs request.

### CONCLUSION

For the above reasons, the Court **DENIES** Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (Doc. 3).

**SO ORDERED.**

June 14, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**